[No. G007218. Fourth Dist., Div. Three. Oct. 30, 1989.]

CANCUN HOMEOWNERS ASSOCIATION, INC., Plaintiff and Appellant, v.
CITY OF SAN JUAN CAPISTRANO, Defendant and Respondent.

COUNSEL

Duke, Gerstel, Shearer & Bregante, Ann M. McMenomy and Alan R. Johnston for Plaintiff and Appellant.

Chapman, Fuller & Bollard, H. Daniel Fuller and Tom Cadden for Defendant and Respondent.

OPINION

SONENSHINE, J.—Cancun Homeowners Association, Inc., appeals a summary judgment granted in favor of the City of San Juan Capistrano (the City). Specifically, Cancun objects to the trial court's conclusion that the City is immune from prosecution for negligence in the issuance of building and grading permits.

I

In 1986 Cancun filed a complaint for damages suffered by its condominium unit owners from the subsidence of the land underlying the property. Defendants included the developer, landscaper, plumbing company, and soil engineers. In a first amended complaint, Cancun added the City as a defendant, contending the building inspector shirked his mandatory duty to ensure all soils be compacted to 90 percent.

The complaint stated all defendants were involved in some manner with the construction, in 1980, of "dwelling structures and/or lots consisting of approximately forty (40) individual condominium units . . . ." After construction was completed, Cancun discovered the improvements were "defective in that the soil underlying said property, as designed and prepared, is inadequate to support the improvements constructed thereon, resulting in substantial settlement and subsidence, and thereby resulting in cracks in the foundations, footings, slabs, walls, ceilings, floors, windows and/or doors of the individual units and common area improvements." The complaint

alleged the defects "were directly and proximately caused by the latent deficiencies in the design, planning, supervision, observation of construction, construction and/or development" of the property.

The eighth count, alleging negligence against the City, incorporated the above-quoted language. It further alleged the existence of ordinances "designed for the purpose of providing for the proper design, planning, inspection, construction completion of projects [*sic*], and which statutes and/or ordinances were further designed for the purpose of protecting purchasers and owners of condominium units, both as to common areas and also as to individual residential units themselves."

The cause of action stated the City "had a mandatory duty to require [the developers] to adequately and sufficiently compact the soils at [the property] to the requirements prescribed in the statutes, ordinances and regulations before issuing grading and building permits to Defendants to erect structures on said property." The City "failed to discharge its duty . . . by issuing grading and building permits to Defendants . . . based on soils reports submitted to CITY by Defendants showing that the soils of [the property] were not compacted pursuant to the requirements for compaction in the applicable statutes, ordinances and regulations." Cancun sought damages in excess of $1 million to correct the defective conditions.[1]

The City moved for summary judgment, alleging the pertinent ordinance, number 367, was discretionary in nature; consequently, the City was immune under Government Code sections 815 and 818.4 from any perceived negligence occurring in the issuance of grading and/or building permits. After consideration of the pleadings, evidence offered, and oral arguments, the court filed its order finding, inter alia, "the city is immune from prosecution for negligence pursuant to the California Tort Claims Act."

## II

■ Although Cancun appeals from an order for summary judgment, which is not the final judgment in the case, review is proper. There are no causes of action remaining which pertain to the City, and Cancun's rights vis-à-vis the City have been definitively adjudicated. (*Etienne* v. *DKM Enterprises, Inc.* (1982) 136 Cal.App.3d 487, 489 [186 Cal.Rptr. 321].)

---

[1] There was a ninth count against the City for inverse condemnation which Cancun intended to dismiss. Consequently, Cancun does not appeal the trial court's judgment on that cause of action.

## III

The parties agree the major, if not sole, issue on appeal is whether the duties prescribed in ordinance number 367 are mandatory or discretionary. It is Cancun's position the language of the ordinance requires the City to ensure that all fill soils, underlying buildings or structures, be compacted to 90 percent, with certain exceptions inapplicable here. The City maintains the enactment is discretionary in its entirety; 90 percent compaction is the stated optimum but it may be waived in the discretion of the building official.

In 1978 the City adopted its own municipal code. Ordinance number 367, composed of two articles, addressed "Buildings and Structures" and "Grading and Excavation." The second article, in 23 sections, sought to safeguard "the public welfare by regulating grading on private property in the City of San Juan Capistrano." It incorporated by reference Uniform Building Code chapter 70 entitled "Excavation and Grading."[2]

Article 2 of the ordinance, "Grading and Excavation," covers permit requirements, fees, bonds, and inspections, as well as cuts, fills, drainage and terracing. Each of the latter specifies the ideal values; under "Fills" are listed the requirements for location, ground preparation, material to be used, compaction, slope and drainage.

The pertinent parts appear in section 11 of "Grading and Excavation," regulating "Fills":

"(a) *General*. Unless otherwise approved by the Building Official and recommended in the approved soil engineering report, fills shall conform to the provisions of this article.

". . . . . . . . . . . . . . . . . . .

"*Exceptions*:

"1. Fills excepted in Section 3, and where the Building Official determines that compaction is not a necessary safety measure to aid in preventing saturation, settlement, slipping, or erosions of the fill.

". . . . . . . . . . . . . . . . . . .

---

[2] The only exceptions to the requirement of a grading permit were for graves, government rights of way, and minimal excavations.

"(e) *Compaction*. All fills shall be compacted to a minimum of ninety (90) percent of maximum density . . . ."

Cancun also points to section 420 of the Uniform Building Code which states: "Shall, as used in this Code, is mandatory."

When the grading and soils reports for the Cancun project were submitted to the City, Building Official Roy Aalbu noticed all fill *to be added* would be compacted to 90 percent. However, attached to the report were some tests taken on the old existing fill indicating certain areas of less than 90 percent compaction. He conferred with the engineer and, based on that discussion, determined to issue the permits.

Cancun argues the City is liable under Government Code section 815.6[3] for failure to perform a mandatory duty, i.e., require compaction of the old fill to meet the 90 percent standard. ■ "[G]iven a mandatory duty, the liability imposed by Government Code section 815.6 . . . takes precedence over the immunity provisions of Government Code section 818.4 . . . ." (*Slagle Constr. Co.* v. *County of Contra Costa* (1977) 67 Cal.App.3d 559, 562 [136 Cal.Rptr. 748].)[4] ■ Consequently, Cancun insists the ordinance establishes "an obligatory duty which a governmental entity is required to perform, as opposed to a permissive power which a governmental entity may exercise or not as it chooses." (*Morris* v. *County of Marin* (1977) 18 Cal.3d 901, 908 [136 Cal.Rptr. 251, 559 P.2d 606].)

The City maintains it is immunized under Government Code sections 818.4 and 821.2; it acknowledges the two sections are applicable only as to discretionary duties, but contends the ordinance itself is discretionary. The City further contends its officials complied with the ordinance, in any event.

■ Not "every statute which uses the word 'shall' is obligatory rather than permissive. Although statutory language is, of course, a most important guide in determining legislative intent, there are unquestionably

---

[3] Government Code section 815.6 provides: "Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty."

[4] Government Code section 818.4 provides: "A public entity is not liable for an injury caused by the issuance, denial, suspension or revocation of, or by the failure or refusal to issue, deny, suspend or revoke, any permit, license, certificate, approval, order, or similar authorization where the public entity or an employee of the public entity is authorized by enactment to determine whether or not such authorization should be issued, denied, suspended or revoked." Section 821.2 provides similar immunity for the employee.

instances in which other factors will indicate that apparent obligatory language was not intended to foreclose a governmental entity's or officer's exercise of discretion. [Citation.]" (*Morris* v. *County of Marin, supra,* 18 Cal.3d 901, 910, fn. 6.)[5]

"Whether a particular statute is intended to impose a mandatory duty is a question of interpretation for the courts. [Citations.] The legislative intent can usually be determined from the statutory language. . . . It is well established that statutes must be given a reasonable construction that conforms to the apparent purpose and intention of the lawmakers [citations], and the various parts of the . . . enactment must be harmonized by considering the particular clause in the context of the whole [enactment]." (*Nunn* v. *State of California* (1984) 35 Cal.3d 616, 624-625 [200 Cal.Rptr. 440, 677 P.2d 846].)

■ Here, the City, rather than merely relying on the Uniform Code, outlined in detail its own version of "Grading and Excavation." It noted at the outset there would be "extensive additional requirements and regulations deemed necessary to meet local conditions." Under the "Fills" section, the enactment emphasized the ideal requirements to follow could be ignored if approved by the building official, either when accompanied by a soils report so recommending or when the official found meeting the valuation requirement was unnecessary.

It is significant the ordinance mimics to a great extent the Uniform Building Code section on excavation and grading; of greater significance is what the City *added*. The Uniform Code chapter 70, section 7009(a), regulating "Cuts" states, "Unless otherwise recommended in the approved soils engineering . . . report cuts shall conform to the provisions of this Section." The adopted City version reads: "Unless *otherwise approved by the Building Official and* recommended in the approved soil engineering [etc.] . . . ." A like addition appears in the section regulating "Fills." The Uniform Code requires: "Unless otherwise recommended in the approved soil engineering report fills shall conform to the requirements of this Section." And what did the City adopt?—"Unless *otherwise approved by the Building*

---

[5] Cancun relies heavily on this court's decision in *Mughrabi* v. *Suzuki* (1988) 197 Cal.App.3d 1212 [243 Cal.Rptr. 438] for the proposition " '[w]hen the Legislature has, as here, used both "shall" and "may" in close proximity in a particular context, we may fairly infer the Legislature intended mandatory and discretionary meanings, respectively.' " (*Id.,* at p. 1215.) However, the facts in *Mughrabi* are considerably different. There, the statute in question provided *only* for a facially mandatory action: A person writing a bad check "shall be liable to the payee" (Civ. Code, § 1719) for the face value of the check plus treble its amount in damages. There was *no allowance* for discretion on the part of the trial court after finding the maker personally liable.

*Official and* recommended in the approved soil engineering report, fills shall conform to the provisions of this section." We think it quite clear the governing body wished to inject more discretion for their building officials than was available in the Uniform Code. It is for this reason the definition of "shall" as "mandatory" in the Uniform Code is of no matter. And the definition by its own terms relates only to the Uniform Code.

We note a separate and concluding section (number 22 entitled "Alternate Method") of the grading article emphasized the discretion with which the City intended to clothe the building officials: "(a) The provisions of this Code are not intended to prevent the use of any material or method of construction not specifically prescribed by this Code, provided any such alternate has been approved pursuant to this section."

And even where there is "Hazardous grading" (§ 23), although the official "shall not issue a permit" in such a case, "[i]f it can be shown to the satisfaction of the Building Official that the hazard can be essentially eliminated by the construction of retaining structures, *Buttress fills,* drainage devices or by other means, the Building Official *may issue* the permit with the condition that such work be performed." (Italics added.)

We are convinced the City intended its building inspectors have the discretion in each instance to determine whether a grading permit should issue. In this vein, Cancun insists Building Official Aalbu knew there was a "risk" when he noted the old fill compaction levels were below 90 percent in some areas; thus, it would be impossible for him to conclude "that compaction was not a necessary safety measure." We disagree for two reasons. First, Cancun has failed to correctly quote Aalbu's declaration. Second, as the City points out, "the issue is not the 'recognition' of a potential problem but rather the resolution of that problem."

The declaration of Aalbu was filed in support of the motion for summary judgment. He stated he "had the primary responsibility for review and approval of the grading plans submitted [for Cancun and the] responsibility to review the soil engineering report that was submitted in connection with the grading plans." He noted the "soils engineer did not recommend that the older fill soil (the 'old fill') be removed and recompacted. Instead, the Report recommended that new fill soil be added (the 'new fill') on top of the old fill and that the new fill be compacted to a minimum of 90% relative compaction." Aalbu stated he reviewed logs of borings contained in an appendix to the report, noting "some of the results of tests performed on the old fill revealed what I interpreted to be compaction levels beneath 90%. I discussed this issue with the engineer, Dale Goss, and he informed me that

the existence of lower compaction levels in the old fill would not pose a risk to the proposed development as long as the new fill that was to be placed on top of the old fill was compacted to 90% or more relative compaction. I was advised that in preparing the soil in this manner, the new fill would act as a 'bridge' over the old fill and would thus not pose a threat or risk to the project as planned."

Aalbu, based on "the recommendations contained in the Report and based upon [his] conversations with the engineer responsible for the Report, determined that removing and recompacting the older fill was not a necessary safety measure to prevent saturation, settlement, slippage or erosion of the fill." After making this determination, he approved the grading plans. This process is precisely what the ordinance contemplated in article 2, section 11, subdivision (a)(1): Fills need not conform to the provisions of the section "where the Building Official determines that compaction is not a necessary safety measure. . . ."[6]

He visited the site often "to observe the work being performed." He received a report, after completion of rough grading, showing "test results of 90% or above." He also received certification from a civil engineer, Eugene Ayer, indicating the grading had been completed in conformance with the grading plans. Aalbu then issued the building permits.

Cancun must agree Aalbu investigated the matter after noticing some of the old fill area had compaction readings below 90 percent. If merely noting the possibility of a problem and investigating its severity precludes a later determination to issue a permit in spite of the deviation, there would be no reason for "including the section 11(a) and section 11(a)(1) language. We may not settle on a construction of the enactment which would render contiguous parts of it entirely superfluous.

Because Cancun appears to argue the permits should not have been issued, it impliedly agrees the ordinance is discretionary—the official could either grant or deny the petition. "Section 818.4 of the Government Code provides that a public entity is not liable for an injury caused by the refusal

---

[6] There is also an argument to be made that the building official complied as well with section 11, subdivision (a), concerning approval by the official *and* recommendation in the approved soils report. He did approve the deviation in the old fill. There is, however, no explicit recommendation in the soils report that the old fill be accepted despite the deviation. Nonetheless, the tests were attached to the report. It seems implicit in the suggested fill over the deviating fill that the soils report "recommended" the process. This is particularly true in light of the building official's discussion with the engineer who prepared the report and the plans; he knew of the old fill tests, yet stated there would be no risk with the "bridge" provided by the new 90 percent compacted fill.

to issue a permit where the entity is authorized by law to determine whether or not the permit should be issued. (See also Gov. Code, § 821.2.) Manifestly this statute is a bar to the [damages] cause of action." (*Selby Realty Co.* v. *City of San Buenaventura* (1973) 10 Cal.3d 110, 127 [109 Cal.Rptr. 799, 514 P.2d 111].)

"California Government Tort Liability (Cont.Ed.Bar 1964), authored by Professor Van Alstyne (who was also the commission's research consultant) states (§ 5.4, p. 121): 'After each new recommended . . . section the commission inserted a comment explaining the section's purpose, . . . its meaning or application. These comments were before the [L]egislature when it enacted [the sections of the code] . . . . Thus, they appear to constitute a useful source of legislative intent, especially where the sections were enacted without substantial alteration [as was Government Code section 818.4].' The comment under section 818.4 states: 'Under this section, for example, the State is immune from liability if the State Division of Industrial Safety issues or fails to issue a safety order and *a city is immune if it issues or refuses to issue a building permit, even though negligence is involved in issuing or failing to issue the order or permit.*'" (*Burns* v. *City Council* (1973) 31 Cal.App.3d 999, 1003 [107 Cal.Rptr. 787].)

■ Moreover, claims for "damages resulting in large part from private improvement and development of property in which the county and city played no part other than their approval of plans and issuance of permits" are not actionable. (*Ellison* v. *City of San Buenaventura* (1976) 60 Cal.App.3d 453, 459 [131 Cal.Rptr. 433].)

■ We conclude ordinance 367, as it pertains to a building official's determination to issue or decline to issue grading permits, is discretionary on its face. And Aalbu's actions, pursuant to the ordinance, indicate he investigated the necessary issues and made an independent discretionary decision based on his investigation. The City, therefore, is immune from tort liability for any injury allegedly occurring as a result of the issuance of the permits.

Judgment affirmed. Respondent to receive costs.

Scoville, P. J., and Wallin, J., concurred.